# EXHIBIT 3

**IN THE APPELLATE DIVISION OF
THE HIGH COURT OF THE REPUBLIC OF SINGAPORE**

**[2023] SGHC(A) 11**

Civil Appeal No 12 of 2022

Between

(1)   General Hotel Management
(Singapore) Pte Ltd
(2)   General Hotel Management,
Ltd

… *Appellants*

And

(1)   The Wave Studio Pte Ltd
(2)   Lee Kar Yin
(3)   The Wave Studio, LLC

… *Respondents*

Civil Appeal No 46 of 2022

Between

(1)   General Hotel Management
(Singapore) Pte Ltd
(2)   General Hotel Management,
Ltd

… *Appellants*

And

(1)   The Wave Studio Pte Ltd
(2)   Lee Kar Yin
(3)   The Wave Studio, LLC

… *Respondents*

# GROUNDS OF DECISION

[Intellectual Property — Copyright — Ownership]
[Intellectual Property — Copyright — Licenses]
[Civil Procedure — Offer to settle]

## TABLE OF CONTENTS

INTRODUCTION.................................................................................1

MATERIAL BACKGROUND FACTS ........................................................2

    THE PARTIES .................................................................................3

    PRODUCTION ESTIMATES ................................................................4

    TAKING OF HOTEL PHOTOGRAPHS ...................................................4

    USE OF THE HOTEL PHOTOGRAPHS IN THE MAGAZINE ....................5

    PROCEDURAL HISTORY ...................................................................6

DECISION BELOW..............................................................................6

ISSUES BEFORE THE COURT ...............................................................10

OUR DECISION ON AD 12 ..................................................................10

    ISSUE 1: THE RESERVATION CLAUSE AND S 30(5) OF THE COPYRIGHT ACT........................................................................................10

        *The appellants' new arguments* .............................................12

        *The proper interpretation of s 30(5) of the Copyright Act*......22

    ISSUE 2: THE IMPLIED LICENCE OR CONSENT ARGUMENT .............31

    ISSUE 3: THE FIRST APPELLANT'S INVOLVEMENT IN THE MAGAZINE...........34

OUR DECISION ON AD 46 ..................................................................36

    WHETHER THE OTS WAS A SERIOUS AND GENUINE OFFER ...........39

    WHETHER THE JUDGMENT OBTAINED WAS LESS FAVOURABLE .....40

CONCLUSION ...................................................................................42

> This judgment is subject to final editorial corrections approved by the court and/or redaction pursuant to the publisher's duty in compliance with the law, for publication in LawNet and/or the Singapore Law Reports.

# General Hotel Management (Singapore) Pte Ltd and another
v
# The Wave Studio Pte Ltd and others

## [2023] SGHC(A) 11

Appellate Division of the High Court — Civil Appeal Nos 12 of 2022 and 46 of 2022
Steven Chong JCA, Woo Bih Li JAD and Aedit Abdullah J
13 February 2023

4 April 2023

**Steven Chong JCA (delivering the grounds of decision of the court):**

## Introduction

1        AD/CA 12/2022 ("AD 12") and AD/CA 46/2022 ("AD 46") were appeals against the decision of a judge in the General Division of the High Court (the "Judge") delivered on 16 June 2022, reported as *The Wave Studio Pte Ltd and others v General Hotel Management (Singapore) Pte Ltd and another* [2022] SGHC 142 (the "GD").

2        AD 12 concerned the proper interpretation of a provision in the Copyright Act (Cap 63, 2006 Rev Ed) (the "Copyright Act") (which has since been repealed) in relation to the commissioning of photographs. The question that was presented to us was: when a client engages a company for a photoshoot, who owns the copyright to the photographs – the client, the company, or the photographer?

*General Hotel Management (Singapore) Pte Ltd*          [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

3      Section 30(2) of the Copyright Act provides the default position that the copyright should belong to the "author", which in the context of photographs, is the photographer. However, that default position can be displaced by s 30(5) of the Copyright Act, which provides that the copyright belongs to the client when the client makes, for valuable consideration, an agreement with another person for the taking of the photographs. In the court below, the Judge held that for the default position to be displaced, the agreement must be made with the *actual photographer* and the agreement must *solely* be for the taking of photographs. For reasons explained below, we respectfully disagreed with the Judge on this point. AD 12 was however, ultimately dismissed as the operation of s 30(5) of the Copyright Act can be excluded by agreement. This was the case here, in the light of a validly incorporated provision in the agreement between the parties which reserved the copyright of the photographs to the company engaged for the photoshoot, *ie*, the respondents.

4      AD 46 was the appellants' appeal against the Judge's award of costs on an indemnity basis. In AD 46, we had to consider whether the respondents' offer to settle ("OTS") was a serious and genuine one; and whether the judgment obtained below was not less favourable than the OTS. AD 46 was allowed on the basis that the judgment obtained was in fact less favourable than the OTS.

5      We heard both appeals on 13 February 2023. AD 12 was dismissed while AD 46 was allowed with brief oral grounds. These are our detailed grounds.

**Material background facts**

6      The background facts have been comprehensively set out in the GD at [4]–[18]. We will therefore only highlight the facts pertinent to the appeals.

2

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

### The parties

7       The second respondent, Ms Lee Kar Yin ("Ms Lee"), an interdisciplinary artist, creative designer and entrepreneur, set up various business entities for the purpose of carrying out her work in the creative industry (collectively, "Wave"). Wave provided design, branding and marketing services. The first respondent, The Wave Studio Pte Ltd, was incorporated on 1 July 2005 in Singapore. The third respondent, The Wave Studio, LLC, was incorporated as a limited liability company in the United States under the laws of New York. Through a series of assignments effected from 2008 to 2013, the third respondent had the eventual ownership of the intellectual property rights to Wave's literary and artistic works.

8       The first appellant was incorporated in Singapore and is a wholly owned subsidiary of the second appellant. The second appellant was a company incorporated in the British Virgin Islands with its principal place of business in Singapore. The appellants were part of the General Hotel Management Group ("GHM"), which managed, operated and promoted luxury hotels and resorts all over the world.

9       Between 1995 and 2008, GHM engaged Ms Lee, as well as Wave, to provide a range of services to the hotels under its management (collectively, the "Hotels"). Wave was appointed by GHM to provide exclusive "one-stop shop" services, which included comprehensive branding and marketing designs for the Hotels that GHM were managing. At the time when Ms Lee began her working relationship with the appellants, Mr Ralf Ohletz Count von Plettenberg ("Mr Ohletz"), the Executive Vice-President of the appellants until 2010, testified that GHM was "not too concerned with the paperwork" and that their

3

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

business was done "on a handshake basis". GHM thus never entered into any
formal written contract of service or commissioning contract with Ms Lee.

### Production Estimates

10      From the outset of Wave's working relationship with the appellants,
Wave would, as part of its standard procedure, provide a document referred to
as a "Production Estimate" to GHM and the Hotels for its work in respect of the
marketing collaterals. Each Production Estimate contained key terms and
conditions that governed the work under each purchase order. Ms Lee or the
relevant Wave entity would also issue to the Hotels an invoice describing the
work done, typically after the provision of the services.

11      Critically, the Production Estimates contained a clause confirming that
any "*intellectual property copyright*" which arose from Wave's work on the
project is owned by Wave (the "Reservation Clause"). The exact wording of
this clause varied over time, though the essence of the clause remained the same.
No objections were raised to the Reservation Clause over the 13 years that Wave
worked with GHM and the Hotels.

### Taking of Hotel Photographs

12      Hotel photoshoots were included as part of the "one-stop shop" services
that Wave was engaged to provide to the Hotels. These were conducted at the
premises of various hotels managed by the second appellant or other companies
in GHM.

13      For the photoshoots, Ms Lee engaged two photographers in the
following capacities:

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

(a)    Mr Masano Kawana ("Mr Kawana") was sub-contracted by Wave for most of the photoshoots, save for the photoshoot of The Saujana, Kuala Lumpur in 2007.

(b)    Mr Lim See Kong ("Mr Lim"), an employee of Wave, was involved in the photoshoot for The Saujana, Kuala Lumpur in 2007.

14    While Mr Kawana and Mr Lim took the raw photographs, Ms Lee was present at each photoshoot and was actively involved in the planning, composition and styling of the photoshoots. After each photoshoot, Ms Lee would commence post-production editing work on the raw images, together with other employees or contractors engaged by Wave. Ms Lee would then conduct a final review to produce a curated collection of photographs appropriate for the respective hotel's branding and design (the "Hotel Photographs").

### *Use of the Hotel Photographs in The Magazine*

15    Sometime in 2012, after the parties' working relationship had ended, it came to Ms Lee's attention that some of the Hotel Photographs were featured on the websites of several online travel agencies. Subsequently, between 18 January 2013 and 30 June 2013, Ms Lee discovered that the Hotel Photographs had appeared on 242 instances in Issues 1 to 12 of GHM's in-house production magazine entitled "The Magazine", which could be accessed and downloaded *via* GHM's website. Issues of The Magazine were also available for download from other websites owned or operated by GHM and copies were distributed to the Hotels managed by GHM and to their guests.

5

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

### Procedural history

16      On 31 December 2013, the third respondent commenced an action against the second appellant and other third parties in the United States District Court (the "US Action") for copyright infringement of the Hotel Photographs. The United States District Court dismissed the third respondent's claims against the second appellant on the grounds of *forum non conveniens* and held that Singapore was the natural forum to determine the ownership of the copyright in the Hotel Photographs. The third respondent's proceedings against the other third parties for copyright infringement of the Hotel Photographs were also stayed pending the resolution of the proceedings in Singapore. Thereafter, on 19 February 2018, the respondents commenced HC/S 175/2018 ("S 175") against the appellants.

17      On 5 January 2021, the respondents served on the appellants an OTS which was not accepted. The trial of the action took place over several tranches from September 2021 to March 2022 and on 16 June 2022, the Judge rendered her decision.

### Decision below

18      The Judge found that the ownership of the copyright in the Hotel Photographs belonged to the relevant Wave entity. In order for s 30(5) of the Copyright Act to apply to photographs, the party purporting to rely on it must have made an agreement for valuable consideration with the photographer for the taking of a photograph. Furthermore, the agreement between Wave and the Hotels was not an agreement for the taking of photographs, but was an agreement for Wave to operate as a "one-stop shop" for the Hotels' branding, design and marketing needs, for which photography was only one function (GD

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

at [50]). The operation of s 30(5) of the Copyright Act was nevertheless excluded by agreement between the parties *per* s 30(3) of the Copyright Act, as the Hotels had accepted Wave's reservation of the copyright in the Hotel Photographs by accepting the Reservation Clause in the Production Estimates (GD at [51]). Through a series of copyright assignments over the years, the owner of the copyright of the Hotel Photographs became the third respondent (GD at [93]–[97]).

19     The Judge found that there was no implied term assigning the copyright in the Hotel Photographs to the Hotels, as the Reservation Clause had been accepted by the Hotels and incorporated into the agreement between the parties. The Reservation Clause was thus an express term of the agreement between the Hotels and Wave. Wave had also included the clause in the Production Estimates issued for the photoshoots and this indicated that they had no intention to assign the ownership of the copyright to the Hotels (GD at [107]–[108]). There was also no implied assignment of copyright to the second appellant (GD at [111]) or implied licence granted by Wave to "use the Hotel Photographs for general branding, marketing and/or advertising purposes" (GD at [122]).

20     The allegedly infringing acts were not disputed. The appellants' case below therefore turned on the issue of who owned the copyright in the Hotel Photographs; and alternatively, whether the Hotels and/or the second appellant had an implied licence to use them. As the Judge found in favour of the respondents on these points, the appellants were determined to have infringed the copyright in the Hotel Photographs in three ways:

(a)      First, the appellants reproduced the Hotel Photographs in The Magazine, without licence or consent from the respondents (GD at [151]).

(b)      Second, the appellants communicated the Hotel Photographs in The Magazine to the general public, by making the said publication available for download on GHM websites from (at least) January 2013 to December 2020 (GD at [152]).

(c)      Third, the appellants imported the infringing copies of The Magazine into Singapore for the purpose of trade, or by way of trade exhibiting The Magazine in public, when the appellants knew or ought reasonably to have known that the making of their publications was carried out without the licence and/or the consent of the respondents (GD at [153]–[154]).

21      The Judge rejected the first appellant's defence of non-involvement as there was evidence to demonstrate the first appellant's involvement in the management of the Hotels and the services provided by Wave to the Hotels. The Judge also drew an adverse inference against the appellants for failing to call Mr Hans Jenni ("Mr Jenni"), the President of GHM, as a witness on the publication of The Magazine. The effect of the adverse inference was to strengthen the evidence adduced by the respondents to prove the joint involvement of the first appellant in publishing the first six issues of The Magazine. The Judge also rejected the second appellant's defences of laches, acquiescence and estoppel by convention (GD at [183]–[189]).

22      The Judge thus granted the respondents the following reliefs:

(a)      declaratory relief in respect of the ownership of the copyright in the Hotel Photographs and the assignment of such copyright to the third respondent (GD at [206]);

(b)      declaratory relief that the GHM entities infringed the copyright in the Hotel Photographs (GD at [206]);

(c)      an injunction under s 119(2)(*a*) of the Copyright Act to restrain the appellants, their officers, employees, servants and agents from further infringing the respondents' copyright in the Hotel Photographs (GD at [207]);

(d)      an order under s 120 of the Copyright Act for the delivery up to the respondents of all infringing copies of the Hotel Photographs in the appellants' possession (GD at [207]); and

(e)      an order under s 120A of the Copyright Act for forfeiture to the respondents or the destruction upon oath of any infringing copies of the Hotel Photographs or any articles used for making infringing copies of the Hotel Photographs (GD at [207]).

23     As for costs, the Judge was satisfied that the costs consequences as set out in O 22A r 9(1) of the Rules of Court (2014 Rev Ed) ("ROC") were applicable, and the respondents were thus entitled to have their costs from 5 January 2021 (the date of the OTS) onwards assessed on an indemnity basis (GD at [236]). The Judge was satisfied that the OTS was a serious and genuine offer (GD at [231]). The OTS served by the respondents was not subject to an expiry date and was not withdrawn by the respondents (GD at [233]). The declaratory reliefs granted to the respondents were also in essence what the

*General Hotel Management (Singapore) Pte Ltd*        [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

respondents had sought in the proposed consent judgment set out in the OTS (GD at [235]).

**Issues before the Court**

24    The three issues to be decided in AD 12 were:

>    (a)    whether the Reservation Clause excluded the operation of s 30(5) of the Copyright Act, such that the respondents own the copyright in the Hotel Photographs ("Issue 1");

>    (b)    whether, if the respondents owned the copyright in the Hotel Photographs, there was an implied licence or consent permitting the appellants to use the Hotel Photographs to market the GHM brand or the Hotels ("Issue 2"); and

>    (c)    the first appellant's involvement in The Magazine ("Issue 3").

25    In AD 46, the sole issue to be considered was whether the Judge erred in ordering the appellants to pay costs on an indemnity basis.

**Our decision on AD 12**

***Issue 1: The Reservation Clause and s 30(5) of the Copyright Act***

26    In determining the ownership of the copyright in the Hotel Photographs, an accurate understanding of the scheme of s 30 of the Copyright Act is essential. The relevant portions of s 30 of the Copyright Act are as follows:

>    **Ownership of copyright in original works**
>
>    **30.**—
>
>    ...

(2) Subject to this section, the author of a literary, dramatic, musical or artistic work shall be entitled to any copyright subsisting in the work by virtue of this Part.

(3) The operation of subsection (4), (5) or (6) in relation to copyright in a particular work may be excluded or modified by agreement.

(4) Where a literary, dramatic or artistic work is made by the author in pursuance of the terms of his employment by the proprietor of a newspaper, magazine or similar periodical under a contract of service or apprenticeship and is so made for the purpose of publication in a newspaper, magazine or similar periodical, the proprietor shall be entitled to any copyright subsisting in the work by virtue of this Part insofar as the copyright relates to —

    (*a*)  publication of the work in any newspaper, magazine or similar periodical; or

    (*b*)  reproduction of the work for the purpose of its being so published,

but not otherwise.

(5) Subject to subsection (4), where —

    (*a*)  a person makes, for valuable consideration, an agreement with another person for the taking of a photograph, the painting or drawing of a portrait or the making of an engraving by the other person; and

    (*b*)  the work is made in pursuance of the agreement,

the first-mentioned person shall be entitled to any copyright subsisting in the work by virtue of this Part, except that if the work is required for any particular purpose, that purpose shall be communicated to that other person and that other person shall be entitled to restrain the doing, otherwise than for that particular purpose, of any act comprised in the copyright in the work.

27    Under s 30(2) of the Copyright Act, the default position is that the owner of the copyright is the "author". In the context of photographs, this would be the photographer as defined in s 7 of the Copyright Act. This default position can be displaced under s 30(5) of the Copyright Act where a person, the client, makes for valuable consideration, an agreement with *another person* for the

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

taking of the photographs. It should immediately be noted that s 30(5) does not make any reference to "author". Instead, it refers to "another person", the significance of which is expounded below. The operation of s 30(5) can, however, be excluded by agreement under s 30(3).

28      The respondents asserted that s 30(5) had no application to the agreement between the parties, as the agreement was not one for the taking of photographs and there was no direct contractual relationship between the Hotels and the photographer. The appellants' arguments on appeal were noticeably new arguments, which we now turn to consider.

*The appellants' new arguments*

29      On appeal, the appellants raised arguments in relation to the proper *interpretation* of the Reservation Clause. This was strikingly different from their case at the trial. In the court below, it was the appellants' case that the Reservation Clause was not validly *incorporated* into the contract. That was the appellants' only pleaded defence against the Reservation Clause. The Judge found otherwise. We noted that there was no appeal against this finding and as such, it was no longer a live issue in the appeal that the Reservation Clause was validly incorporated into the contract.

30      It was undisputed that the appellants' arguments on the interpretation of the Reservation Clause were new, and that leave of court was required under O 57 r 9A(4) of the ROC to pursue these arguments on appeal. Having considered the scheme of s 30 of the Copyright Act, it was unsurprising that the appellants' new arguments focused on the proper interpretation of the Reservation Clause – should the appellants fail on their arguments in relation to the Reservation Clause and an implied licence, their appeal could not succeed

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

even if the Judge had erred on her interpretation of s 30(5) of the Copyright Act. However, the appellants faced two distinct difficulties in advancing their new arguments.

31      First, in their pleadings, the appellants challenged the Reservation Clause on the sole basis that it had not been validly incorporated, which was also their case at the trial. The appellants were advancing a new defence in relation to the *interpretation* of the Reservation Clause. This was essentially an attempt to advance a new case on appeal. As cautioned by the Court of Appeal in *JWR Pte Ltd v Edmond Pereira Law Corp and another* [2020] 2 SLR 744 ("*JWR*"), such conduct can amount to an abuse of the appeal process as in such a case, there would be no appeal at all. In *JWR*, the appellant attempted to advance a new allegation of negligence against the respondents that was not raised during the trial. The Court of Appeal considered that the appellant's case on appeal "sought to do much more than merely raise an additional legal point in support of its appeal" but was "seeking to discard the entire basis on which its case proceeded during the three days of trial" (*JWR* at [31]). By its new case, the appellant was not challenging the trial judge's decision with which it was dissatisfied, but was instead seeking to conduct a second trial (*JWR* at [32]).

32      While the appellants did deny in their Defence that the Reservation Clause constituted an agreement to exclude the operation of s 30(5), the appellants' case at the trial was confined to whether the Reservation Clause had been brought to the attention of GHM and/or the Hotels. This led the Judge to make the unequivocal statement that there was *no dispute* as to the interpretation of the Reservation Clause before her (GD at [67]):

> **The defendants did not dispute that the clear meaning of the Reservation Clause was that the plaintiffs retained the copyright to the Hotel Photographs.** However, the defendants

*General Hotel Management (Singapore) Pte Ltd*          [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

> disputed that the Reservation Clause had contractual effect:
> they submitted that the clause was unilaterally inserted by
> Ms Lee and never brought to Mr Ohletz's attention. ...
>
> [emphasis added]

The Judge therefore focused her analysis on whether the Reservation Clause
was *validly incorporated* into the agreement between the parties (GD at [67]–
[78]). There were no findings made in relation to the *interpretation* of the
Reservation Clause as there was no necessity to do so.

33     Given that the Judge made no findings in relation to the interpretation of
the Reservation Clause, the appellants' appeal on this point thus could not have
arisen from any dissatisfaction from the Judge's decision. The basis of this new
argument did not stem from an examination of whether the Judge was wrong in
reaching the conclusions set out in her decision, as this point was not even
placed before her. We echoed the Court of Appeal's comments in *JWR* that an
appellate court should not be treated like a second trial court, as this would be
an abuse of the appeal process.

34     Second, leave of court is required under O 57 r 9A(4) of the ROC to
advance any new arguments on appeal. Order 57 r 9A(4) of the ROC states:

> (4)    If a party —
>
>> (*a*)    is abandoning any point taken in the Court below; or
>>
>> (*b*)    intends to apply in the course of the hearing for leave
>>     to introduce a new point not taken in the Court
>>     below,
>
> this should be stated clearly in the Case, and if the new point
> referred to in sub-paragraph (*b*) involves the introduction of
> fresh evidence, this should also be stated clearly in the Case
> and an application for leave must be made under Rule 16 to
> adduce the fresh evidence.

35     It should be noted that failing to indicate one's basic intention to seek leave would, in most cases, be fatal to the application for leave. As noted by this court in *Wei Ho-Hung v Lyu Jun* [2022] 2 SLR 1066, "if an appellant or respondent fails to state his intention to apply for leave in his written case, and yet comes before an appellate court to seek such leave, he should be prepared to provide a very good explanation for his omission" (at [16]).

36     Typically, leave will be granted if the new arguments pertain to a question of law where no fresh evidence or amendment to the pleadings on either side is required (*Grace Electrical Engineering Pte Ltd v Te Deum Engineering Pte Ltd* [2018] 1 SLR 76 at [36]–[37], citing *Feoso (Singapore) Pte Ltd v Faith Maritime Co Ltd* [2003] 3 SLR(R) 556 at [34]). We recognised that the new argument mounted by the appellants was concerned with a question of *contractual interpretation*. This would be an objective exercise and the subjective views of the parties and their witnesses in relation to their interpretation of the Reservation Clause might not have been decisive or relevant.

37     However, not only were the arguments on the *interpretation* of the Reservation Clause not pleaded, the appellants' case on appeal was also contradicted by their own evidence below. To illustrate this, we turn to consider the appellants' new arguments in relation to the Reservation Clause. As highlighted in the GD (at [64]), the varying forms in which the Reservation Clauses were worded included:

    (a)     "We reserve the intellectual property copyright to all designs / projects undertaken";

  (b)    "We reserve the intellectual property copyright to all designs /
         photographs / projects undertaken"; or

  (c)    "We reserve the intellectual property copyright to all designs /
         soft copies / material / photographs / projects undertaken".

While the exact wording of this clause varied over time, the essence of the
clause remained the same – that the copyright in the Hotel Photographs were
reserved by the respondents.

38     On appeal, the appellants submitted that the Reservation Clause should
be reasonably construed as the respondents "simply stating that they are not
waiving (or are 'reserving') whatever intellectual property rights they possess
or would ordinarily come to possess at law". The appellants further submitted
that their proposed interpretation should not be "confused with an agreement
between the parties that section 30(5) of the [Copyright Act] would be
inoperative".

39     It was apparent to us that the appellants' new positive case was *contrary*
to their own evidence below and advancing such new arguments would amount
to an abuse of process. Significantly, in the court below, the appellants did not
dispute the clear meaning of the Reservation Clause. In fact, the second
appellant's pleaded defence at the trial was that Ms Lee did not bring to the
second appellant or the Hotels' attention the wording of the Reservation Clause.
Any dispute in relation to the interpretation of the Reservation Clause was
therefore not before the Judge below.

40     The appellants' witnesses also acknowledged the clear meaning of the
Reservation Clause. In particular, Ms Alison Claire Fraser ("Ms Fraser"), the

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

former General Manager of two of the Hotels operated by GHM, unequivocally stated at the trial that the effect of the Reservation Clause was that Wave reserved the copyright in the Hotel Photographs. There was also contemporaneous evidence in the form of emails where the appellants expressly acknowledged the respondents' copyright to the Hotel Photographs. As comprehensively outlined by the Judge (GD at [83]–[91]), GHM's senior management had, on at least three occasions, acknowledged that Wave was the owner of the copyright in the Hotel Photographs. This express acknowledgement was indicative of GHM's acceptance that the ownership of the copyright in the Hotel Photographs had vested in Wave.

41     In any case, we were convinced that even on a consideration of the appellants' new arguments and adopting an objective interpretation of the Reservation Clause, its meaning was clear. On appeal, the appellants made two submissions in support of its interpretation of the Reservation Clause: first, that the purpose of the Production Estimate was to communicate the estimated costs and charges for the services, and not to record any agreement between the parties in relation to the statutory position under s 30(5) of the Copyright Act. Second, within this context, the Reservation Clause should be construed to mean only that Wave was not waiving or was reserving whatever intellectual property rights they possess or would ordinarily come to possess at law. At the appeal hearing, the appellants' counsel, Dr Stanley Lai SC, further elaborated that the Reservation Clause "cannot apply to copyright that, as a matter of law, did not even reside with the respondents in the first place". This was because the language of s 30(5) of the Copyright Act appeared to allow one to "partition" the purpose for which the work is done, and therefore the Reservation Clause should not be read to have displaced the operation of s 30(5) for the works commissioned by the appellants.

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

42     We disagreed with the appellants for two reasons. First, we were of the
view that the purpose of the Production Estimate did not make the Reservation
Clause *any less* a contractual term to govern the agreement. The effect of the
Production Estimate was akin to a quotation provided by the respondents to the
appellants detailing the scope of work to be done and the corresponding prices.
While a mere quotation that is not intended to give rise to any binding legal
obligation will not constitute an offer in law, it is necessary to consider the
construction of the language of the quotation concerned (*The Law of Contract
in Singapore* vol 1 (Andrew Phang Boon Leong gen ed) (Academy Publishing,
2nd Ed, 2022) at para 03.087). In the absence of any other formal contractual
documents or agreements, we were of the view that the Production Estimate was
an offer by the respondents which, once accepted by the appellants, formed an
agreement subject to the terms set out therein. The Production Estimate
contained essential terms, including the parties, the price and the subject matter.
The Production Estimate also outlined the terms of the payment and a
cancellation clause. There were also negotiations on the terms in the Production
Estimate, and after the negotiations were complete, Mr Ohletz and/or the
relevant GHM representative would sign on the Production Estimate and issue
a purchase order on the terms of the Production Estimate, indicating the
appellants' acceptance to the terms. The work that was carried out by the
respondents were in accordance with the items listed in the Production
Estimates. It was thus common ground between the parties that the various
agreements were all subject to the terms set out in the various Production
Estimates, one of which was the Reservation Clause. We were therefore of the
view that the Production Estimates, and therefore the Reservation Clause, had
legal effect.

43      Second, while the court's task is to interpret the Reservation Clause, we were of the view that no reasonable interpretation of the Reservation Clause had been put forth by the appellants. The appellants' submission that the Reservation Clause could not reserve the copyright to the Hotel Photographs if the respondents did not already own the copyright offered no interpretation as to the meaning and scope of the Reservation Clause. Instead, the appellants' interpretation had the practical effect of *nullifying* the contractual force of the Reservation Clause which, on a plain reading, was clear that the respondents own the works that they were commissioned to create. The strained interpretation put forth by the appellants also did not sit well with the clear statutory exception in s 30(3) of the Copyright Act, that parties can modify the default position by agreement.

44      We also did not agree with the appellants' argument that s 30(5) of the Copyright Act contemplates the "partitioning" of purposes. Section 30(5) provides that "if the work is required for any particular purpose, that purpose shall be communicated to that other person and that other person shall be entitled to restrain the doing, otherwise than for that particular purpose, of any act comprised in the copyright in the work." This essentially gives the commissioned party the statutory right to restrain the commissioner, *ie*, the client from exploiting the work for a purpose beyond the scope of the agreement. We were unable to see how this right of restraint led to the appellants' interpretation that the Reservation Clause was not an agreement to exclude the operation of s 30(5) of the Copyright Act.

45      We also considered a clause of similar construction to the Reservation Clause that featured in *Lee Wei Ling and another v Attorney-General* [2017] 2 SLR 786 ("*Lee Wei Ling*"). That case concerned an oral history project

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

undertaken by the Government, which involved several tape recordings and transcripts of interviews with the late Mr Lee Kuan Yew ("Mr Lee"). Mr Lee had signed an interview agreement with the Secretary to the Cabinet and the former Director of the Archives and Oral History Department of the Ministry of Culture, which contained the following clause ("Clause 2(a)"):

> 2.    The use and administration of the recordings and transcripts shall be subject to the following terms and conditions:-
>
> > (a) I retain to myself all copyright including literary property rights to the recordings and transcripts until the year two thousand (2000) or 5 years after my death, whichever is later, at which time all copyright including any literary property rights in the recordings and transcripts shall vest in the Government of Singapore;
>
> …

The Court of Appeal determined that the effect of Clause 2(a) was that the ownership of the copyright in the interview transcripts and recording was vested in Mr Lee until the year 2000. The Court of Appeal also considered that there was evidence that Clause 2(a) was negotiated upon (*Lee Wei Ling* at [48]). This was, significantly, a departure from the default position under s 18 of the Copyright Act 1911 (Cap 46), which is, in material terms, retained in ss 197(1) and 197(5) of the Copyright Act, and which provides that the copyright in a work published under the direction or control of any Government department vests in the Government.

46    Similar to s 30(5) of the Copyright Act, s 18 of the Copyright Act 1911 provided that the copyright in the work is "subject to any agreement" made with the author. This was retained in s 197(6) of the Copyright Act. The Court of Appeal in *Lee Wei Ling* gave primacy to the "clear and unambiguous wording" of Clause 2(a) (at [47]) to vary the default statutory position. Similarly, we were

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

of the view that the language of the Reservation Clause was clear, and that primacy must be given to the parties' agreement to vary the default statutory position as *per* s 30(3) of the Copyright Act.

47      The appellants also relied on the *contra proferentem* rule in support of the argument that the Reservation Clause should be construed as the respondents stating only that they were not waiving the intellectual property rights they possess or would ordinarily come to possess at law. We were of the view that this was misconceived. It has been clearly established that, in order for the *contra proferentem* rule to apply, two questions must be considered: whether there was any ambiguity in the contract; and if so, who was the party against whom the clauses were sought to be interpreted against (*LTT Global Consultants v BMC Academy Pte Ltd* [2011] 3 SLR 903 at [56]–[57]). In our view, the present case failed at the first stage, as there was no ambiguity in the Reservation Clause. The plain language of the Reservation Clause was abundantly clear – that Wave reserved the intellectual property copyright in all designs, soft copies, material, photographs and projects undertaken.

48      For completeness, the appellants submitted that there was a "similarly worded" clause in the English Court of Appeal case of *R Griggs Groups Ltd and others v Evans and others* [2005] EWCA Civ 11 ("*Griggs*") that the court found was not incorporated. Briefly, in *Griggs*, the claimant commissioned an advertising agency to create a logo. The logo was done by the first defendant, who was working at the advertising agency on a freelance basis. The first defendant then purported to assign the legal title to the second defendant, a competitor of the claimant. The first defendant argued that he retained the copyright in the work. The case turned on the terms of the commissioning

21

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

contract between the *advertising agency* and the *first defendant*. There was evidence that the advertising agency had, on its invoices, the following clause:

> The copyright in all artwork copy story-boards and films or televised commercials and other creative works created or commissioned by the Agency will rest in the Agency. If such material is to be published or developed by the client the Agency reserves the specific right to charge an appropriate fee in respect of copyright assignment and or loss of remuneration.

49      However, the clause in issue had *no* relevance to the contract between the advertising agency and the first defendant, as the clause was found on the invoices issued by the advertising agency to the claimant. As such, while Jacob LJ remarked in *obiter* that the clause was "ill-drafted" and seemed to "prevent the client from using the material for the agreed original intended purpose" (at [24]), the clause was *irrelevant* to the dispute between the parties in *Griggs*. We were thus of the view that *Griggs* provided no assistance to the appellants' case.

50      For the above reasons, we were of the view that leave should not be granted to the appellants to advance their new points on appeal. In any case, even if leave had been granted, the appellants' arguments in relation to the interpretation of the Reservation Clause would not have succeeded.

*The proper interpretation of s 30(5) of the Copyright Act*

51      Since we had determined that there was no issue with the proper interpretation and incorporation of the Reservation Clause, the operation of s 30(5) of the Copyright Act was thus effectively excluded by agreement. The appellants' reliance on s 30(5) of the Copyright Act would not have made any difference to the outcome. Nevertheless, we provided some brief views on the proper interpretation of s 30(5).

*General Hotel Management (Singapore) Pte Ltd*　　　　　　[2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

52    Section 30(5) of the Copyright Act states:

> (5) Subject to subsection (4), where —
>
> > (*a*)    a person makes, for valuable consideration, **an agreement with another person for the taking of a photograph**, the painting or drawing of a portrait or the making of an engraving **by the other person**; and
> >
> > (*b*) **the work is made in pursuance of the agreement**,
>
> the **first-mentioned person shall be entitled to any copyright subsisting in the work by virtue of this Part**, except that if the work is required for any particular purpose, that purpose shall be communicated to that other person and that other person shall be entitled to restrain the doing, otherwise than for that particular purpose, of any act comprised in the copyright in the work.
>
> [emphasis added]

53    We further noted that s 7 of the Copyright Act defines "author" in relation to a photograph as follows:

> "author", in relation to a photograph, means the **person who took the photograph**; …
>
> [emphasis added]

54    In the court below, the Judge was of the view that for s 30(5) of the Copyright Act to apply in favour of the appellants, the agreement must be made with the actual photographer, *ie,* Mr Kawana, the photographer who took the raw images; and that the agreement between the parties was not an agreement for the taking of photographs within the meaning of s 30(5) of the Copyright Act, but was an agreement for a "one-stop shop" service for the branding, design and marketing needs of the appellants.

55    With respect, we did not agree with either of the Judge's findings. Under s 30(5) of the Copyright Act, there is no need for privity of contract between the

client and the author. Also, the agreement did not have to be *exclusively* for photography, as long as photography was a component of the agreement. We consider each reason in turn below.

(1)      Privity of contract and s 30(5) of the Copyright Act

56      For s 30(5) of the Copyright Act to apply in favour of the appellants, there is no statutory requirement that the agreement must be with the photographer who took the photographs. A plain reading of s 30(5) is clear that there is *no* express requirement that "another person" must be the author, *ie*, the photographer. All that is required under s 30(5) of the Copyright Act is that a person (the client) must pay valuable consideration to "another person" for the taking of a photograph, and the work is made pursuant to this agreement.

57      Furthermore, the word "author", though referred to in s 30(2) of the Copyright Act, is noticeably absent in s 30(5). In our view, it is clear that this distinction between "author" and "another person" is deliberate, as Parliament shuns tautology and does not legislate in vain (*Tan Cheng Bock v Attorney-General* [2017] 2 SLR 850 at [38], citing *JD Ltd v Comptroller of Income Tax* [2006] 1 SLR 484 at [43]). As such, while "another person" is broad enough to encompass the "author", "another person" could also refer to a third party to the agreement.

58      As such, the relevant inquiry is to examine whether there was an agreement with *another person* for the taking of photographs. What is material for the operation of s 30(5) of the Copyright Act is that the photographs were taken pursuant to an agreement for valuable consideration, and the person who commissioned the photographs pursuant to the agreement has ownership of the copyright in the photographs. Any other interpretation of s 30(5) would lead to

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

unworkable consequences that would disadvantage parties who commissioned the taking of the photographs. It is common for photographers to be sub-contracted to create works (as Mr Kawana was, in the present case), such that there is no direct contractual relationship between the photographer and the client. If "another person" is read restrictively as the author, *ie*, the photographer, this would deprive the party who commissioned the taking of the photographs of the copyright in the work that they paid for should the commissioned party unilaterally decide to sub-contract the photoshoot to a freelance photographer. Viewed in this manner, a restrictive reading of "another person" would effectively deprive s 30(5) of its intended legal effect.

59    This was in fact the case here. As far as the appellants were concerned, it did not matter who the actual photographer was, as long as the work was done by the respondents under the agreement with the appellants. The appellants also appeared fully aware that it was not Ms Lee herself who took the photographs, but that she would sub-contract photographers for the job. The choice of photographer was completely left to Ms Lee. In fact, the appellants did not know who took the photographs until much later. However, we were of the view that this arrangement in itself did not deprive the appellants of the ownership of the copyright under s 30(5) of the Copyright Act, as there was no statutory requirement for a direct contractual relationship between the appellants and Mr Kawana.

60    We noted that the Judge below, in reliance on the High Court case of *Wang Choong Li v Wong Wan Chin* [2015] 4 SLR 41 ("*Wang Choong Li*"), concluded that a direct contractual relationship was required between the commissioning party and the photographer for the former to acquire copyright in the photographs under s 30(5) of the Copyright Act (GD at [43]). In *Wang*

25

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

*Choong Li*, the respondent bride contracted with the appellant bridal boutique owner for the provision of wedding services, including photography services. There was no documentation showing a direct contractual relationship between the respondent and the photographer, nor any testimony to that effect. The High Court noted that the respondent had engaged the appellant to provide photography and that there was no intention for the respondent to enter into a contract with the photographer. In the absence of an actual commission of the wedding day photographer by the respondent, the copyright did not reside in the respondent for the purposes of s 30(5) of the Copyright Act (*Wang Choong Li* at [63]–[64]).

61     However, we did not think that the decision in *Wang Choong Li* was helpful or relevant to the dispute before us. In *Wang Choong Li*, it was *common ground* between the parties that there must be privity of contract between the actual photographer and the client for the purposes of s 30(5) of the Copyright Act. There were no submissions on any alternative interpretation of s 30(5), and certainly none to the effect as we have explained (at [56]–[58] above). In fact, the scope of the issue before the court in *Wang Choong Li* was whether an agency relationship could be found such that privity of contract between the photographer and the client could be established (*Wang Choong Li* at [15]–[16]). Notably, the respondent in *Wang Choong Li* had attempted to justify a direct contractual relationship between the respondent and the photographer for the operation of s 30(5) of the Copyright Act on the basis of agency law, prompting Abdullah JC (as he then was) to make the finding that an agency relationship was "highly artificial" (*Wang Choong Li* at [63]). For this reason, none of the points considered above were placed before the court in *Wang Choong Li*.

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

62    With respect, we were of the view that the Judge's reliance on *Wang Choong Li* unduly restricted the operation of s 30(5) of the Copyright Act. However, in fairness to the Judge, we were aware that the points made at [56]– [58] above were not argued before her. The parties in the present case appeared to have proceeded on the understanding that privity of contract was required for the operation of s 30(5), with Dr Lai only requesting to adopt the interpretation of s 30(5) set out above as part of the appellants' arguments after we had outlined this during the appeal hearing.

63    For completeness, we noted the respondents' submission that there was no need for this court to determine whether privity of contract was required between the commissioning party and the author of the work as this was "no longer a live issue". The respondents pointed to the fact that the Copyright Act had been repealed and that the Copyright Act 2021 (Act 22 of 2021), which came into force on 21 November 2021, now provides that the author of a work will own the copyright in the work by default. In support of this argument, counsel for the respondents, Mr Mahesh Rai, cited the Court of Appeal case of *Tan Ng Kuang Nicky (the duly appointed joint and several liquidator of Sembawang Engineers and Constructors Pte Ltd (in compulsory liquidation)) and others v Metax Eco Solutions Pte Ltd* [2021] 1 SLR 1135 ("*Nicky Tan*"). In that case, a five-judge coram of the Court of Appeal was convened to decide a novel point of insolvency law. The parties had, however, reached a settlement but allowed the appeal to continue as if the issue was live instead of apprising the court of the settlement that had been reached. The court found that counsel had breached their duties to the court and disapproved of their conduct in proceeding with the appeal without disclosing the settlement.

27

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

64      The respondents' reliance on *Nicky Tan* was clearly misplaced. Despite the repeal of the Copyright Act, the dispute as to whether s 30(5) of the Copyright Act applied to the arrangement between the parties remained a *live issue* before this court. While our views on s 30(5) may have little application to future cases, it could hardly be said that the arguments before us on this issue were purely academic. Mr Rai readily conceded this point when this was brought to his attention.

(2)      Agreement for a "one-stop shop"

65      We were also of the view that s 30(5) of the Copyright Act did not require that the agreement be *solely* for the taking of photographs. Section 30 of the Copyright Act is situated under Part 3 on "Copyright in Original Literary, Dramatic, Musical and Artistic Works". Copyright protection for such works can be seen to achieve the overall purpose of providing incentives for the creation and production of creative works (see Ng-Loy Wee Loon, *Law of Intellectual Property of Singapore* (Sweet & Maxwell, 3rd Ed, 2021) at paras 5.1.1–5.1.2). The default position under s 30(2) is in line with this overarching rationale, as the person who creates a work enjoys first ownership of the copyright in their work.

66      However, as exceptions to the default rule, the policy goals which ss 30(4), 30(5) and 30(6) of the Copyright Act seek to achieve are slightly different. These provisions vest copyright ownership in the party that provides consideration for its creation. To illustrate, under ss 30(4) and 30(6), employers, subject to contrary agreement, are the owners of copyright in works made by their employees in the course of their employment. Specifically:

(a)     Section 30(4) provides that the copyright of literary, dramatic, musical and artistic works made by a journalist employee belongs to his or her employer.

(b)     Section 30(6) provides that the copyright of literary, dramatic, musical and artistic works made by an employee in the course of employment are vested in the employer.

67     The employer, who provides consideration through the remuneration of the employee and has an influence on the nature of the work created, has first ownership of the work made by an employee in the course of employment. This justification similarly underwrites s 30(5) of the Copyright Act, which vests first ownership in the person who commissioned the work created pursuant to an agreement. As such, reading s 30(5) in the context of the surrounding provisions, what is essential is that *valuable consideration* was paid for the taking of photographs. The agreement therefore need not be *solely* for photography services. As long as *some part* of the agreement entailed the taking of photographs, the copyright in the photographs should vest in the commissioning parties.

68     In the present case, while the respondents were engaged to be a "one-stop shop" for the appellants and to provide comprehensive branding and marketing design projects for the Hotels, a critical part of this agreement was to take photographs of each Hotel's property and vicinity that would then be used in the marketing collaterals. The numerous Production Estimates, which detailed the job description and deliverables by the respondents to the appellants, all expressly referred to "photography" and "photoshoot". It was also abundantly clear that the photoshoots were a critical part of the agreement

29

between the parties, and were heavily featured in the marketing collaterals created by Wave. This was also evidenced by the fact that at the start of their working relationship, as some of the Hotels were relatively new, photographs of the Hotel premises were particularly important to the marketing of the Hotels. Ms Lee would also on occasion organise and direct the photoshoots *in anticipation* of the Hotels and GHM later ordering marketing collaterals. Mr Ohletz also testified that the key distinguishing element of the Hotel brochures was the photography. It can thus be concluded that the agreement between the parties fundamentally entailed the taking of photographs.

69      The fact that the Hotel Photographs were touched up and edited by Ms Lee further strengthened our view that the Hotel Photographs were the work of Wave. Ms Lee had an extremely active role in the process of the photoshoots. Ms Lee gave undisputed evidence that she would "stage and art direct the photoshoot", including "direct[ing] the angles and composition of each [photograph] frame". The images taken by Mr Kawana were then further processed and edited by Ms Lee. Consequently, it was only the final images which had undergone Ms Lee's editing and review that were presented to GHM. Ms Lee's considerable creative input in the photographic process thus made it clear that the author of the Hotel Photographs was, in any event, Wave and not Mr Kawana.

70      There was thus no need for the agreement to be one *solely* for the purposes of taking photographs. If there was such a requirement, this would mean that for s 30(5) to be operative, the appellants would have had to enter into two *separate* contracts with the respondents: the first for the taking of photographs and the second for the other creative services, and only the former

would attract the operation of s 30(5). That would not make any commercial sense.

### Issue 2: The implied licence or consent argument

71    The appellants submitted that the Judge had also erred in finding that the reproduction of the Hotel Photographs amounted to an infringement of copyright, as there was an implied licence/consent permitting the reproduction of the Hotel Photographs for the general purpose of marketing. We were of the view that this argument could not succeed.

72    At the outset, we noted that the second appellant pleaded that there was an "implied term of the arrangement between the parties that the photographs could be used … for branding, marketing and/or advertising of Hotels or Project Hotels without restriction as to time or manner of use". For a finding of an implied term in the agreement between the parties, the appellants would have to satisfy the three-step test laid down in *Sembcorp Marine Ltd v PPL Holdings Pte Ltd and another and another appeal* [2013] 4 SLR 193 ("*Sembcorp Marine*"). This test requires the court to ascertain whether (*Sembcorp Marine* at [101]):

    (a)    there is a gap in the contract that can be remedied by implication;

    (b)    it is necessary in the business or commercial sense to imply the term to give the contract efficacy; and

    (c)    the suggested term is so obvious that if it had been suggested at the time of contracting, the parties would have agreed to such a term immediately.

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

In addition, the reference point for the implication of a term is at the time of contracting. The presumed intention of the parties thus has to be assessed at the time when they entered into the contract.

73     We note that no specific attempt was made by the appellants to satisfy any stage of the three-step test laid down in *Sembcorp Marine*. Any attempt to do so would have, in any case, failed in the face of the express language of the Reservation Clause. We agreed with the Judge below that to imply a term into the agreement would directly contradict the express reservation of copyright in the Production Estimates (GD at [107]).

74     Nevertheless, we were of the view that the appellants would not have been able to satisfy any step of the *Sembcorp Marine* test. The appellants had not shown that there was a lacuna in the agreement between Wave and GHM that must be filled by the implication of a licence in order to give effect to the parties' presumed intentions. The appellants asserted that the ambit of the licence "extended to the use of the Hotel Photographs … for future marketing activities connected with the GHM brand and Hotels managed under the GHM brand" and that this was evidenced by the respondents' awareness of the "cross-selling" that the Hotels did to market other Hotels under the GHM group, and "the reference to all the Hotels managed and operated under the GHM brand in the GHM brochure and calendars". However, in the absence of any express agreement or agreement by consent that the parties could use the Hotel Photographs in an unrestricted manner for marketing purposes, this had no relevance to the ability of the appellants or the Hotels to allow persons other than Wave to use the Hotel Photographs to produce marketing and promotional materials.

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

75    In relation to the second stage of the *Sembcorp Marine* test, the
implication of such a term would also not have been necessary to give business
efficacy to the agreements between GHM and Wave. As the Judge had found,
it was in line with the concept of a "one-stop solution" aimed at ensuring a
consistent "look and feel" across the various Hotels that the Hotel Photographs
were produced *by Wave* only for use in the marketing and promotional materials
produced *by Wave* (GD at [76]). The appellants did not adduce any evidence
that there had been third party vendors that were brought in to work on the
marketing and promotional materials using the Hotel Photographs, as Wave was
the sole vendor which the appellants had used for almost 13 years. There was
thus no *necessity* for an implied licence to be granted to the appellants to
reproduce the Hotel Photographs.

76    The appellants were also unable to fulfil the last stage of the *Sembcorp
Marine* test. Implying the appellants' proposed term that the Hotels had an
unrestricted and perpetual licence to use the Hotel Photographs for the general
purpose of marketing would also fail the third stage of the *Sembcorp Marine*
test. This was an extremely broad term that was unnecessary to give business
efficacy to the agreement between the parties, and also was not one to which the
parties would have responded "Oh, of course!"

77    On appeal, the appellants focused on the argument that there was an
*implied licence* granted to the appellants, though conceding that this was not the
basis of the appellants' pleadings or case below. In support of this argument, the
appellants made a comparison with a quotation provided to them by another
photography company, Memphis West Pictures Pte Ltd ("Memphis West"). In
particular, the appellants pointed out that Memphis West charged $2,000 per
day for photography services, whereas Wave charged about $4,000 per day for

photography services. The quotations provided by Memphis West contained a clause stating that the images were "licensed to [the relevant Hotel] and [GHM] for use in perpetuity". Given that the Wave entities were paid twice as much compared to Memphis West, the appellants submitted that the licence to use the Hotel Photographs could not possibly be limited for use only in the marketing materials provided by the Wave entities.

78     With respect, this mathematical comparison was completely irrelevant to the matter at hand. The conduct of the parties subsequent to the date of contracting was irrelevant in determining if a term should be implied, as the reference point for the implication of a term is at the time of contracting (*Sembcorp Marine* at [127]). This was especially so in this case since the contracts which the appellants were purporting to rely on were with a different party altogether, with whom the appellants had agreed on a completely different set of terms under different circumstances.

79     As such, there was no implied licence or consent that was given to the appellants to reproduce the Hotel Photographs in The Magazine.

### Issue 3: The first appellant's involvement in The Magazine

80     The last issue in AD 46 was in respect of the first appellant's involvement in the production and publication of The Magazine. The appellants argued that the first appellant was not involved in the production and publication of The Magazine for the following reasons:

(a)     The first appellant was not involved in Issues 5 and 6 of The Magazine, and therefore there was "no good reason" to believe that the first appellant would be involved in Issues 1 to 4 of The Magazine.

(b)     The second appellant made the payments to The Magazine's editor. This is "strong evidence" that the second appellant was the party behind the production and publication of The Magazine.

(c)     The second appellant uploaded The Magazine to the GHM websites and made it available for download.

81      We were of the view that this argument could be easily disposed of. On the last page of the first six issues of The Magazine, the publisher and producer of The Magazine was *expressly* stated to be the first appellant. On this point alone, we were unable to see how the finding by the Judge could be said to be against the weight of the evidence.

82      Furthermore, we agreed with the Judge that there was a lack of a clear distinction between the operations of the first and second appellant. The first and second appellant shared the same directors. Mr Ohletz himself also testified that when there were insufficient funds in the accounts of the second appellant, the first appellant would assist to settle the payments. There was thus no distinction between the first and second appellants when it came to the payment of invoices and bills.

83      The appellants also submitted that the Judge was wrong to have drawn an adverse inference against the appellants for failing to call Mr Jenni (who was overall responsible for The Magazine) as a witness. We disagreed. Mr Jenni's evidence was in fact material to the proceedings, as he was responsible for the publication of The Magazine. At the hearing below, Mr Ohletz testified that Mr Jenni was "entirely in charge" of the publication of The Magazine, together with one Mr James Graf. The appellants' witnesses who testified at the trial, including Mr Ohletz and Ms Fraser, were also not involved in the publication

of The Magazine. Mr Jenni's evidence on the involvement of the first appellant with The Magazine would thus have been material. We were thus of the view that the Judge was justified in drawing an adverse inference against the appellants for failing to produce Mr Jenni at the trial.

84     For the above reasons, we were of the view that the first appellant was involved in the production and publication of The Magazine and was rightly found to be liable to the respondents.

**Our decision on AD 46**

85     In our judgment, the Judge did err in ordering costs against the appellant on an indemnity basis. Although we agreed with the Judge that the OTS was a serious and genuine one, the judgment obtained below (the "Judgment") was less favourable than the OTS.

86     It was undisputed that on 5 January 2021, the respondents served on the appellants an OTS which required the parties to agree to a draft consent judgment (attached as Annex A to the OTS) (the "Consent Judgment"). This proposed Consent Judgment required the appellants to agree to, *inter alia*, the following terms:

> (a)     that the respondents owned the copyright in the Hotel Photographs, that no licence (whether express or implied) was granted to any third parties to reproduce or deal with the Hotel Photographs in any manner, and that the appellants had wilfully and intentionally infringed the respondents' copyright in the Hotel Photographs despite knowing that neither they nor their current or former clients ever had any copyright or license to reproduce or deal with the photographs;

(b)　　that the respondents and other persons or entities acting in concert or participation with GHM are permanently restrained and enjoined from using any of the Hotel Photographs anywhere on any medium for any purpose, and from enabling or facilitating any third party to use the Hotel Photographs;

(c)　　that within 30 days of acceptance of the OTS, the appellants would deliver up to the respondents all copies of the Hotel Photographs and/or any articles used for making the copies of the Hotel Photographs;

(d)　　that the appellants agree that they, or any other person or entity for whom GHM or their affiliates may have acted as a manager or agent (including but not limited to the GHM entities' current or former clients), did not have any rights or licences (express or implied) with respect to the copyright in the Hotel Photographs, or defences to the infringement of the third respondent's copyright in the Hotel Photographs;

(e)　　that the respondents would waive their claims against the appellants for damages arising from the causes of action raised in S 175; and

(f)　　that the appellants would pay the respondents' standard costs in S 175 as at the date of acceptance of the OTS.

87　　Order 22A r 9(1) of the ROC states:

(1)　　Where an offer to settle made by a plaintiff –

　　　　(a)　　is not withdrawn and has not expired before the disposal of the claim in respect of which the offer to settle is made; and

(b)    is not accepted by the defendant, and the plaintiff obtains a judgment not less favourable than the terms of the offer to settle,

the plaintiff is entitled to costs on the standard basis to the date an offer to settle was served and costs on the indemnity basis from that date, unless the Court orders otherwise.

88    As the appellants did not accept the respondents' OTS, the general rule on costs under O 22A r 9(1) of the ROC would apply if two conditions are satisfied. First, the OTS must not have been withdrawn or the time limit for acceptance must not have expired before the disposal of the claim in respect of which the offer to settle is made. Second, the judgment obtained is not less favourable than the terms of the OTS (*Ong & Ong Pte Ltd v Fairview Developments Pte Ltd* [2015] 2 SLR 470 at [19(f)]).

89    The principles on offers to settle are well established by several salient decisions of the Court of Appeal. In particular, the OTS must be a serious and genuine offer and not just to entail the payment of costs on an indemnity basis (*Man B&W Diesel S E Asia Pte Ltd and another v PT Bumi International Tankers and another appeal* [2004] 3 SLR(R) 267 ("*Man B&W Diesel*") at [8]). The OTS should also contain an element which would induce or facilitate settlement. As such, an offer to compromise for 100% of the amount claimed has no element of compromise in it (*Man B&W Diesel* at [11], citing *Tickell v Trifleska Pty Ltd* (1991) 25 NSWLR 353).

90    In the present case, there was no dispute that the OTS was not subject to an expiry date and had not been withdrawn by the respondents at any point. As such, the two questions before us in relation to the OTS were whether the OTS was a serious and genuine offer, and whether the Judgment obtained was less favourable than the OTS.

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

### Whether the OTS was a serious and genuine offer

91    The appellants submitted that the OTS was not a serious and genuine offer of compromise because it required them to "capitulate on the issue of liability" after S 175 had been bifurcated.

92    In support of this, the appellants cited the case of *Colliers International (Singapore) v Senkee Logistics Pte Ltd* [2007] 2 SLR(R) 230 ("*Colliers International (Singapore)*"). In that case, the plaintiff submitted that the defendant's OTS was not a genuine or serious offer to settle but a "tactical move to obtain indemnity costs" (at [104]). The court considered that the defendant's offer of $10,000 was "derisory" in comparison to the plaintiff's claim of $300,000 (at [111]). The court also made reference to the case of *Singapore Airlines Ltd v Fujitsu Microelectronics (Malaysia) Sdn Bhd and others* [2001] 1 SLR(R) 38 where the appellant offered $347 to settle the respondent's claim of US$286,344.14 for the loss of a package which the appellant carried from Tokyo to Kuala Lumpur *via* Singapore. In that case, the court held that there was no incentive to settle nor was there a genuine effort to settle the crux of the dispute (*Colliers International (Singapore)* at [112]–[114]).

93    However, the present OTS could be clearly distinguished from that in *Colliers International (Singapore)*. Unlike the OTS in *Colliers International (Singapore)*, the present OTS was not a "tactical move" to obtain indemnity costs. There was no "derisory" offer that was made. Instead, there was a legitimate basis and incentive to settle in the offer made – that the respondents would waive their rights to damages arising from the causes of action raised in S 175. The OTS made by the respondents was for the purpose of facilitating a genuine settlement between the parties, and not just to secure indemnity costs.

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

We were thus of the unequivocal view that the OTS was a serious and genuine one.

### Whether the Judgment obtained was less favourable

94    In determining whether the judgment obtained is less favourable than the terms of the OTS, the court should consider *all the terms* of the OTS (*NTUC Foodfare Co-operative Ltd v SIA Engineering Co Ltd and another* [2018] 2 SLR 1043 at [21]–[22], citing *CCM Industrial Pte Ltd v Uniquetech Pte Ltd* [2009] 2 SLR(R) 20 at [40]). The settlement sum stated in the OTS would thus not be the only relevant factor.

95    The appellants submitted that the OTS required the appellants to agree that *third parties*, including those with whom the appellants no longer had any business relations, did not have any defences to a claim for copyright infringement in respect of the Hotel Photographs. There was no reason that they had to agree to such a term to resolve the specific dispute between the parties. In support of this, the appellants also pointed out that a number of third parties named as defendants in the US Action sought indemnification from the second appellant on the basis that they had received the Hotel Photographs from the second appellant, and that the Consent Judgment, if agreed to, would have resulted in significant exposure for the second appellant in the US Action. This argument led the respondents to submit that the appellants' potential exposure to indemnification claims was raised by the appellants for the first time on appeal and therefore should not be allowed.

96    In our view, the appellants' new argument in relation to the potential impact of the Consent Judgment missed the point as to whether the Judgment obtained was less favourable than the terms of the OTS. Instead, the inquiry

*General Hotel Management (Singapore) Pte Ltd*                    [2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

simply involved a straightforward exercise of examining the terms of the OTS
with reference to the Judgment obtained by the respondents in the court below.

97     For convenience, we set out the relevant paragraphs of the OTS in full
here:

> 2. The Plaintiffs agree to waive their claims against only the 1st
> and 2nd Defendants and not any other person or entity,
> including but not limited to the 1st and 2nd Defendants' legal
> or beneficial owners, investors, members, partners, parents,
> subsidiaries, corporate affiliates, shareholders, employees,
> officers, directors, successors, predecessors, agents,
> administrators, trustees, managers, beneficiaries, trusts,
> trustees, or assigns, for damages arising from the causes of
> action raised in the Suit.
>
> …
>
> 6. … The 1st and 2nd Defendants further agree that neither the
> 1st and 2nd Defendants nor any other person or entity for
> whom they or their affiliates may have acted as a manager or
> agent (including but not limited to the 1st and 2nd Defendants'
> current or former clients) have any defences with respect to the
> infringement of the 3rd Plaintiff's copyright in the Hotel
> Photographs.

98     Paragraph 6 of the OTS had an extremely broad effect, as it essentially
required the appellants to admit that they and *other entities*, including their
managers and agents, did not have any defences to the infringement. It should
be noted that this admission was not limited to S 175. It was also significant that
the waiver of claims set out in paragraph 2 of the OTS only extended to the
appellants and specifically excluded all other parties referred to in paragraph 6.
This might suggest that the respondents have intention to pursue their claims of
copyright infringement in the Hotel Photographs against other third parties in
the US Action following our decision. That was not before us.

41

99      We noted that the remedy sought in paragraph 6 was *not* pleaded by the respondents, and an examination of the Judgment revealed that the remedy sought was also not granted by the court below. This was not unexpected since the remedy sought in paragraph 6 was a remedy which the court *could not* have granted, as the court could not require the appellants to admit that other parties (who were not parties in this action) had no defences whatsoever to the infringement.

100     While the court below did grant an injunction to restrain the appellants and other entities under their control from using the photographs *moving forward*, this was clearly distinct from requiring the appellants to admit that they and *other entities*, including their managers and agents, have no defences to *any prior* infringement. Viewed in this manner, it was clear that the Judgment obtained by the respondents was indeed less favourable than the OTS.

101     Consequently, costs should have been ordered on a standard basis. The costs order was thus revised downwards from $300,000 plus disbursements to $200,000 plus disbursements.

**Conclusion**

102     The appellants' appeal in AD 12 was therefore dismissed while the appeal in AD 46 was allowed. The appellants were ordered to pay the respondents net costs of $45,000, inclusive of disbursements for both appeals.

*General Hotel Management (Singapore) Pte Ltd*　　　　　[2023] SGHC(A) 11
*v The Wave Studio Pte Ltd*

In addition, the respondents were ordered to refund the excess of the costs retained by them to the appellants. The usual consequential orders applied.

Steven Chong
Judge of the Court of Appeal

Woo Bih Li
Judge of the Appellate Division

Aedit Abdullah
Judge

Lai Tze Chang Stanley SC, Ramesh Kumar s/o Ramasamy and
Edmond Lim Tian Zhong (Allen & Gledhill LLP) for the appellants;
Mahesh Rai s/o Vedprakash Rai, Yong Wei Jun Jonathan and Samuel
Soo Kuok Heng (Drew & Napier LLC) for the respondents.

Certified True Copy

Manager, Judge's Chambers
Supreme Court Singapore

43